ON DAVIS, Plaintiff–Appellant,

v.

The GAP, INC., Defendant–Appellee.

Docket No. 99–9081.

United States Court of Appeals,
Second Circuit.

Argued June 27, 2000.

Decided April 3, 2001.

As Amended May 15, 2001.

Kenneth Spole, Syosset, NY (On Davis, pro se, on the brief) for Appellant.

Lorin L. Reisner, Debevoise & Plimpton, New York, NY (Suzanne J. Irving on the brief) for Appellees.

Before: LEVAL, PARKER and KATZMANN, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff On Davis ("Davis") appeals from an order of the United States District Court for the Southern District of New York (Sweet, *J.*) granting summary judgment to the defendant, The Gap, Inc. ("the Gap"), dismissing plaintiff's claim of copyright infringement. *See On Davis v. The Gap, Inc.*, No. 97 CIV. 8606(RWS), 1999 WL 199005 (S.D.N.Y. Apr.9, 1999) ("*Davis I* "); *Davis v. The Gap, Inc.*, 186 F.R.D. 322 (S.D.N.Y.1999) ("*Davis II* ").

Davis is the creator and designer of nonfunctional jewelry worn over the eyes in the manner of eyeglasses. The Gap, Inc. is a major international retailer of clothing and accessories marketed largely to a youthful customer base with annual revenues of several billions of dollars. It operates several chains of retail stores, some under the name "Gap." It is undisputed that the Gap, without Davis's permission, used a photograph of an individual wearing Davis's copyrighted eyewear in an advertisement for the stores operating under the "Gap" trademark that was widely displayed throughout the United States. Davis brought this action seeking a declaratory judgment of infringement and damages, including $2,500,000 in unpaid licensing fees, a percentage of the Gap's profits, punitive damages of $10,000,000, and attorney's fees. The district court granted summary judgment for the Gap on the grounds that (1) Davis's claims for actual damages and profits under 17 U.S.C. § 504(b) (1994) were too speculative to support recovery, or were otherwise barred by a prior ruling of this court, (2) he was not eligible for statutory damages or attorney's fees because he had not timely registered his copyright, and (3) the Copyright Act does not permit recovery of punitive damages. *See Davis I,* 1999 WL 199005, at *3–8. We affirm in part and, in part, vacate and remand.

### BACKGROUND

Davis has created at least fifteen different designs of eye jewelry, which he markets under the name "Onoculii Designs." Davis describes Onoculii eyewear as "sculptured metallic ornamental wearable art." *Am. Compl.* ¶ 7. Each piece is made of gold, silver, or brass, and is constructed in a manner similar to eyeglasses (a frame hinged to templates that hook over the ears), but with very different effect. The frames support decorative, perforated metallic discs or plates in the place that would be occupied by the lenses of a pair of eyeglasses. The discs effectively conceal the wearer's eyes, although the perforations permit the wearer to see through them. Some of Davis's designs are of flowery or abstract filagree shapes, some are crescents with protruding spokes or wings. The particular piece that gives rise to this action consists of a horizontal bar at the level of the eyebrows from which are suspended a pair of slightly convex, circular discs of polished metal covering the eyes, perforated with dozens of tiny pinprick holes. Davis registered his copyright for the design at issue, effective May 16, 1997.

Davis sought to gain recognition for his Onoculii line by promoting and marketing his designs "in carefully chosen media settings." *Am. Compl.* ¶ 13. As part of his marketing plan, Davis encouraged "known stylish and popular entertainers" to wear his creations in public settings. *Pl's Counter 56.1(c) Statement,* ¶ 8. Entertainers who have worn Onoculii designs while appearing on stage, on MTV, in magazine photographs or other media include Vernon Reid, Thomas Mapfumo, Don Cherry, Sun Ra, Ryo Kawasaki, Cat Coore, Mr. Pepper Seed, Chuck Johnson, and Jack and Jill. Various fashion designers have also featured Davis's eyewear as accessories in runway shows or photographs, and his work has been noted in such publications as *Vogue, Women's Wear Daily, Fashion Market, In Fashion, The New York Times, The New York Post,* and *The Village Voice.*

While Davis initially sold his designs on the street, since about 1995 he has marketed his merchandise through boutiques and optical stores. The eyewear sold at a wholesale price of approximately $30–45 a pair. Evidence in the record indicates

that it sold at retail for $65–100 a pair in 1995. *See Am. Compl.,* Ex. B. Davis asserts he has earned approximately $10,000 from sales. He testified that on one occasion he received a $50 fee from *Vibe* magazine for the use of a photograph depicting the musician Sun Ra wearing an Onoculii piece.

In May 1996, prior to Davis's registration of his copyright, the defendant created a series of advertisements showing photographs of people of various lifestyles wearing Gap clothing. The campaign was designed to promote the concept that Gap merchandise is worn by people of all kinds. The ad in question, which bears the caption "fast" emblazoned in red (the "fast" ad), depicts a group of seven young people probably in their twenties, of Asian appearance, standing in a loose V formation staring at the camera with a sultry, pouty, provocative look. The group projects the image of funky intimates of a lively after-hours rock music club. They are dressed primarily in black, exhibiting bare arms and partly bare chests, goatees (accompanied in one case by bleached, streaked hair), large-brimmed, Western-style hats, and distinctive eye shades, worn either over their eyes, on their hats, or cocked over the top of their heads. The central figure, at the apex of the V formation, is wearing Davis's highly distinctive Onoculii eyewear; he peers over the metal disks directly into the camera lens.

The "fast" photograph was taken by the Gap in May 1996 during a photo shoot in the Tribeca area of Manhattan. The defendant provided the subjects with Gap apparel to wear for the shoot, and a trailer in which to change. The Gap claims that it did not furnish eyewear to any of the subjects, and that the subjects were told to wear their own eyewear, wristwatches, earrings, nose-rings or other incidental items, thereby "permitting each person to project accurately his or her own personal image and appearance." *Def.'s 56.1(c) Statement,* ¶ 18.

The Gap's "fast" advertisement was published in a variety of magazines, including *W, Vanity Fair, Spin, Details,* and *Entertainment Weekly.* Davis claims that the total circulation of these magazines was over 2,500,000. For five weeks during August and September of 1996, the advertisement was displayed on the sides of buses in New York, Boston, Chicago, San Francisco, Atlanta, Washington, D.C., and Seattle. The advertisement may also have been displayed on bus shelters. According to Davis, when used on buses the photograph was cropped so that only the heads and shoulders of the subjects were shown.

Davis submitted evidence showing that during the fourth quarter of 1996, the period that Davis asserts is relevant to the "fast" advertisement, the net annual sales of the parent company, Gap, Inc., increased by about 10 percent, compared to the fourth quarter of 1995, to $1.668 billion dollars. There was no evidence of what portion of the parent company's revenues were attributable to the stores operated under the Gap label, much less what portion was related to the ad in question.

Shortly after seeing the "fast" advertisement in October and November 1996, Davis contacted the Gap by telephone and in writing. The Gap's advertising campaign, which apparently ran during August and September of 1996, had been completed by the time Davis wrote. Davis stated that he had not authorized the use of his design and inquired whether the Gap might be interested in selling a line of his eyewear.

Davis filed this action on November 19, 1997. The Gap then filed a motion for summary judgment, arguing, *inter alia,* that Davis had no entitlement to damages

and that his claims were barred by the *de minimis* and fair use doctrines.

■ On April 9, 1999, the district court granted summary judgment for the Gap. *See Davis I*, 1999 WL 199005, at *10. The district court first noted that Davis was not eligible for "statutory damages" under 17 U.S.C. § 504(c) due to the fact that he had not registered his copyright within three months of his first "publication" of his work or prior to the allegedly infringing use by the Gap.[1] As regards damages under 17 U.S.C. § 504(b), the court rejected Davis's claim as unduly speculative and, insofar as it sought damages for Davis's failure to receive a license fee from the Gap, precluded by a prior decision of this court. *See Davis I*, 1999 WL 199005, at *3–*7. Since the court also found Davis ineligible for punitive damages, it concluded that he was not entitled to any form of damages, and thus dismissed his claims. *See id.* at *8, *10. Davis filed a motion for reconsideration on April 27, 1999, which was denied on June 16, 1999. *See Davis II*, 186 F.R.D. 322.

On appeal, Davis argues principally that (1) the district court erred by granting summary judgment without ruling on the merits of his claim for declaratory relief; and (2) he was entitled to both compensatory and punitive damages. The Gap defends the district court's judgment and argues in addition that the suit was subject to dismissal under the *de minimis* and fair use doctrines.

We affirm in part and reverse in part.

## DISCUSSION

Summary judgment is proper when the record, viewed in the light most favorable to the party against whom judgment is sought, reveals "no genuine issue as to any material fact" and the moving party is entitled to summary judgment as a matter of law. *See Fed.R.Civ.P.* 56(c).

### A. Declaratory Relief

■ Davis contends that it was improper for the district court to grant summary judgment on his copyright claims without first determining whether the defendant infringed his copyright. The complaint expressly sought "a declaratory judgment in favor of Mr. Davis against GAP, declaring" that the Gap had infringed Davis's copyright by its reproduction of his eyewear in its advertisement. *Am. Compl.*, ¶ A. The district court granted the defendant's motion for summary judgment on the basis of a variety of theories that had no bearing on the demand for declaratory relief. No doubt because of the confusing and prolix nature of the complaint, this aspect of the relief sought was overlooked. The existence of damages suffered is not an essential element of a claim for copyright infringement. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (to establish a *prima facie* case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original"); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01, at 13–6

---

1. 17 U.S.C. § 412 specifies that a copyright holder is not entitled to elect statutory damages or receive attorney's fees under §§ 504 and 505 if "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the

work." Because the allegedly infringing use of Davis's eyewear occurred in the late summer of 1996, far more than three months after the first publication of the eyewear in 1991 but before registration of the copyright on May 16, 1997, Davis is ineligible for statutory damages or attorney's fees.

(1999) ("Notably absent from this formulation of the *prima facie* case is damage or any harm to [the] plaintiff resulting from the infringement."). The owner of a copyright is thus entitled to prevail in a claim for declaratory judgment of infringement without showing entitlement to monetary relief. Insofar as the judgment dismissed the claim for declaratory relief without discussion, we are obliged to vacate the judgment and remand for consideration of that claim.

## B. *Compensatory Damages*

■ 17 U.S.C. § 504 imposes two categories of compensatory damages. Taking care to specify that double recovery is not permitted where the two categories overlap, the statute provides for the recovery of both the infringer's profits and the copyright owner's "actual damages." [2] It is important that these two categories of compensation have different justifications and are based on different financial data. The award of the infringer's profits examines the facts only from the infringer's point of view. If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing. The award of the owner's actual damages looks at the facts from the point of view of they copyright owner; it undertakes to compensate the owner for any harm he suffered by reason of the infringer's illegal act. *See generally Fitzgerald Publ'g Co. v. Baylor Publ'g Co.,* 807 F.2d 1110, 1118 (2d Cir.1986); *Walker*

*v. Forbes, Inc.,* 28 F.3d 409, 412 (4th Cir. 1994).

The district court granted summary judgment dismissing Davis's claims for damages. As for Davis's claim of entitlement to a part of the "infringer's profits," the district court believed Davis failed to show any causal connection between the infringement and the defendant's profits. With respect to Davis's claim of entitlement to "actual damages" based on the license fee he should have been paid for the Gap's unauthorized use of his copyrighted material, the district court believed that his evidence was too speculative and that our decision in *Business Trends Analysts, Inc. v. Freedonia Group, Inc.,* 887 F.2d 399 (2d Cir.1989), precluded any such award.

We agree with the district court as to the defendant's profits, but not as to Davis's claim for damages based on the Gap's failure to pay him a reasonable license fee.

### 1. *Infringer's profits*

■ Davis submitted evidence that, during and shortly after the Gap's advertising campaign featuring the "fast" ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year. The district court considered this evidence inadequate to sustain a judgment in the

---

2. Section 504(a) makes the infringer liable for
 (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or
 (2) statutory damages, as provided by subsection (c).
 17 U.S.C. § 504(a). Section 504(b) goes on to provide:
 The copyright owner is entitled to recover the actual damages suffered ... as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.
 17 U.S.C. § 504(b).

plaintiff's favor because the overall revenues of the Gap, Inc. had no reasonable relationship to the act of alleged infringement. *See Davis I,* 1999 WL 199005, at *6. Because the ad infringed only with respect to Gap label stores and eyewear, we agree with the district court that it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.

■ It is true that a highly literal interpretation of the statute would favor Davis. It says that "the copyright owner is required to present proof only of the infringer's gross revenue," 17 U.S.C. § 504(b), leaving it to the infringer to prove what portions of its revenue are not attributable to the infringement. Nonetheless we think the term "gross revenue" under the statute means gross revenue reasonably related to the infringement, not unrelated revenues.

Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including

particularly the other poems contained in the volume. The point would be clearer still if the defendant publisher were part of a conglomerate corporation that also received income from agriculture, canning, shipping, and real estate development. While the burden-shifting statute undoubtedly intended to ease plaintiff's burden in proving the defendant's profits, we do not believe it would shift the burden so far as to permit a plaintiff in such a case to satisfy his burden by showing gross revenues from agriculture, canning, shipping and real estate where the infringement consisted of the unauthorized publication of a poem. The facts of this case are less extreme; nonetheless, the point remains the same: the statutory term "infringer's gross revenue" should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement.

The district court relied on the Seventh Circuit's ruling in *Taylor v. Meirick,* 712 F.2d 1112 (7th Cir.1983). In that case the defendant was a map-maker, who copied and sold three of the plaintiff's copyrighted maps. During the relevant time period the defendant sold 150 maps, as well as other merchandise. Plaintiff submitted evidence of gross revenues and profits deriving from the defendant's overall sales. The court rejected plaintiff's claim, reasoning:

> all [the burden shifting language of § 504(b)] means is that [the plaintiff] could have made out a prima facie case for an award of infringer's profits by showing [the defendant's] gross revenues from the sale of the infringing maps. It was not enough to show [the defendant's] gross revenues from the sale of everything he sold. . . .

*Id.* at 1122.

Applying this reasoning to our case, we think the district court was correct in rul-

ing that Davis failed to discharge his burden by submitting The Gap, Inc.'s gross revenue of $1.668 billion—revenue derived in part from sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by the advertisement, not to mention sales under the "Gap" label of jeans, khakis, shirts, underwear, cosmetics, children's clothing, and infantwear.

### 2. The copyright owner's actual damages: Davis's failure to receive a reasonable licensing fee

Among the elements Davis sought to prove as damages was the failure to receive a reasonable license fee from the Gap for its use of his copyrighted eyewear. The complaint asserted an entitlement to a $2.5 million licensing fee. The district court rejected the claim on two grounds. First, the court found that Davis's claim was too speculative—that is, insufficiently supported by evidence. *See Davis I*, 1999 WL 199005, at *5. Second, the court believed that our decision in *Business Trends*, 887 F.2d 399, bars a copyright owner's claim for actual damages consisting of the infringer's failure to pay the fair market value of a license fee for the use the infringer made. *See Davis I*, 1999 WL 199005, at *6–*7.

### a. Was Davis's evidence too speculative?

■ While there was no evidence to support Davis's wildly inflated claim of entitlement to $2.5 million, in our view his evidence did support a much more modest claim of a fair market value for a license to use his design in the ad. In addition to his evidence of numerous instances in which rock music stars wore Onoculii eyewear in photographs exhibited in music publications, Davis testified that on one occasion he was paid a royalty of $50 for the publication by *Vibe* magazine of a photo of the deceased musician Sun Ra wearing Davis's eyewear.

On the basis of this evidence, a jury could reasonably find that Davis established a fair market value of at least $50 as a fee for the use of an image of his copyrighted design. This evidence was sufficiently concrete to support a finding of fair market value of $50 for the type of use made by *Vibe*. And if Davis could show at trial that the Gap used the image in a wider circulation than *Vibe*, that might justify a finding that the market value for the Gap's use of the eyewear was higher than $50. Therefore, to the extent the district court dismissed the case because Davis's evidence of the market value of a license fee was too speculative, we believe this was error.

### b. Our decision in Business Trends

■ The district court believed our decision in *Business Trends* interprets § 504(b) to foreclose "actual damages" to compensate a plaintiff for the defendant's failure to pay for the reasonable value of what the defendant took. We believe this was a misreading of the holding in *Business Trends*. The district court decision under review in that case had not made an award of "actual damages" under this theory. The award we reviewed and rejected in that case was fashioned under the other prong of § 504(b)—the infringer's profits. *See Business Trends*, 887 F.2d at 402. While there is indeed some language in our *Business Trends* decision expressing disfavor for Davis's theory of actual damages, it was not at issue in that case. Furthermore, our decision did not purport to lay down an absolute rule; the decision made clear that our ruling depended on the particular factual circumstances—circumstances that are not present here. Finally, as we discuss below, both before and after *Business Trends*, we have either

awarded such damages or implied that they were appropriate. *See Rogers v. Koons,* 960 F.2d 301, 310–13 (2d Cir.1992); *Abeshouse v. Ultragraphics, Inc.,* 754 F.2d 467, 470–72 (2d Cir.1985); *Szekely v. Eagle Lion Films, Inc.,* 242 F.2d 266, 268–69 (2d Cir.1957). Moreover, other courts have adopted the same analysis, and the Supreme Court has suggested, albeit obliquely, that such a measure of damages is appropriate. *See Harper & Row Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

In *Business Trends,* the plaintiff and defendant were competitors in the publication of economic analyses and forecasts—not a relationship where the defendant was a potential licensee of the plaintiff. Each produced a study of the robotics industry. The plaintiff BTA marketed copies of its study for $1,500. The defendant TFG produced a similar study which it initially offered at the same price as BTA's study. In response to slow sales, defendant TFG cut its price by 90% to $150 during a three-month special-offer period. It sold 37 copies at the reduced price. Plaintiff BTA registered its study with the Copyright Office but only after the defendant had begun selling its version. *See Business Trends,* 887 F.2d at 401.

BTA sued TFG alleging that TFG's report included portions that were copied from BTA's. The district court found copying and substantial similarity. It awarded damages of $54,028.35. The damages were found solely for the infringer's profits under the second prong of § 504(b). No damages were awarded under the first prong for the "actual damages" suffered by the owner. In fact, the district court expressly found that plaintiff "failed to establish actual damages as a consequence of defendants' infringement of BTA's robotics study." *Business Trends Analysts,*

*Inc. v. Freedonia Group, Inc.,* 700 F.Supp. 1213, 1233 (S.D.N.Y.1988).

The infringer's profits awarded were derived from two components: a smaller component consisting of TFG's cash profit (revenues minus expenses) on its sale of the robotics study, and a larger amount consisting of non-cash profit attributed in part to the value of acquired goodwill (a "value of use") deriving in part from TFG's giving the report to customers at a 90% markdown. *See Business Trends,* 700 F.Supp. at 1237–41. In justifying the proposition that the profits of the infringement could properly include non-cash benefits to the infringer resulting from the infringement, the district court referred to the Seventh Circuit's conclusion in *Deltak, Inc. v. Advanced Sys., Inc.,* 767 F.2d 357 (7th Cir.1985), that " 'saved acquisition cost is a measure of damages or profit' when calculating value of use under the statute, where cash was not generated." *Business Trends,* 700 F.Supp. at 1238 (quoting *Deltak,* 767 F.2d at 362 n. 3).

We affirmed the award insofar as it was based on TFG's cash profit from the sale of the infringing report. However, insofar as the district court had attributed profits to the defendant based on non-cash elements consisting either of goodwill achieved by giving the infringing study to customers at a heavily discounted price, or the "value of use" the defendant achieved by acquiring for free material for which it might otherwise have paid the plaintiff, we found such attribution of profit to the defendant inappropriate. *See Business Trends,* 887 F.2d at 404–407.

We noted that the district court had based its analysis of the non-cash elements of the defendant's profits in part on *Deltak's* reasoning. *See Business Trends,* 887 F.2d at 404–405. We declined to adopt *Deltak's* approach, relying primarily on two reasons. *See id.* at 405. First, we

believed the instructions of § 504(b) relating to the proof of the "infringer's profits" indicated "that Congress means 'profits' in the lay sense of gross revenue less out-of-pocket costs, not the fictive purchase price that TFG hypothetically chose not to pay to BTA." *Id.* at 405–06. Second, given the defendant's larcenous intent and the competitive relationship between the plaintiff and the defendant, we believed it was unreasonable to find that the defendant profited within the meaning of the statute by copying for free rather than paying the price it might have negotiated with the plaintiff. *See id.* at 405 ("TFG no more priced the BTA study and then decided to copy than a purse-snatcher decides to forego friendly negotiations.").

The sole issue before us was whether either the expenses saved by the infringer resulting from its decision to infringe rather than purchase or the goodwill the defendant generated by offering the infringing material to its customers at a greatly reduced price can be considered "infringer's profits" recoverable under § 504(b). The decision did not involve the question we now consider—whether the amount the owner failed to collect as a reasonable royalty or license fee could be considered as constituting the owner's actual damages under § 504(a) and (b).[3]

It is true that the *Business Trends* decision, in a digression, observed "that [actual damages] is hardly a reasonable description of the entirely hypothetical sales to TFG lost by BTA." *Id.* at 405. The opinion also quoted a lengthy passage from the Nimmer treatise which asserts "it is open to question" whether *Deltak's* "value of use" standard fits within the statutory limits for either actual damages or infringer's profits. *See Business Trends*, 887 F.2d at 406.

For two reasons, we believe *Business Trends* does not foreclose the use of the owner's loss of a reasonable royalty as its "actual damages" under § 504(a) and (b). First, as noted, that issue was not before the court. Whatever comments we made about "actual damages" were dicta. Second, we went to pains in *Business Trends* to make clear that we were *not* laying down an absolute rule, but rather making a ruling that was heavily influenced by the particular facts of that case. We rejected the defendant's argument that a "value of use" standard is always impermissible, saying "we see no legal barrier to such an award under Section 504(b) so long as the amount of the award is based on a factual basis rather than 'undue speculation.'" *Id.* at 404. Again at the conclusion of the opinion we "emphasize[d] that we are not rejecting as a matter of law" a recognition of the "value of use" theory. *Id.* at 407. We held "only that the proof in the instant case is inadequate to support such an award." *Id.*[4]

To the extent that the *Business Trends* decision was based on its observation that the defendant before it was no more inclined to negotiate a purchase price than a "purse snatcher," the facts of our case are

---

3. *See Encyclopedia Brown Prods. Ltd. v. Home Box Office, Inc.*, 25 F.Supp.2d 395, 400–02 (S.D.N.Y.1998) (reading *Business Trends* to preclude license fee under "profits" prong of § 504(b), but not to preclude license fee under "actual damages" prong); *Childress v. Taylor*, 798 F.Supp. 981, 991 (S.D.N.Y.1992) (questioning "whether *Business Trends* precludes as a matter of law [plaintiff's] claim for lost royalties").

4. *See Sunset Lamp Corp. v. Alsy Corp.*, 749 F.Supp. 520, 524 (S.D.N.Y.1990) (reading *Business Trends* as "merely limit[ing] the extent of actual recovery to amounts proved to have resulted from a defendant's infringement, as demonstrated by credible evidence").

significantly different. The Gap was not seeking, like the *Business Trends* defendant, to surreptitiously steal material owned by a competitor. There is no reason to suppose that the Gap's use of Davis's copyrighted eyewear without first receiving his permission was attributable to anything other than oversight or mistake. To the contrary, the facts of this case support the view that the Gap and Davis could have happily discussed the payment of a fee, and that Davis's consent, if sought, could have been had for very little money, since significant advantages might flow to him from having his eyewear displayed in the Gap's ad. Alternatively, if Davis's demands had been excessive, the Gap would in all likelihood have simply eliminated Davis's eyewear from the photograph. Where the *Business Trends* decision was motivated by its perception of the unrealistic nature of a suggestion that the infringer might have bargained with the owner, *see* 887 F.2d at 405, such a scenario was in no way unlikely in the present case.

c. *Actual damages under § 504(a) and (b)*

Because *Business Trends* did not rule on, much less foreclose, the use of a reasonable license fee theory as the measure of damages suffered by Davis when the Gap used his material without payment, we proceed to consider whether that measure of damages is permissible under the statute.

The question is as follows: Assume that the copyright owner proves that the defendant has infringed his work. He proves also that a license to make such use of the work has a fair market value, but does not show that the infringement caused him lost sales, lost opportunities to license, or diminution in the value of the copyright. The only proven loss lies in the owner's failure to receive payment by the infringer of the fair market value of the use illegally appropriated. Should the owner's claim for "actual damages" under § 504(b) be dismissed? Or should the court award damages corresponding to the fair market value of the use appropriated by the infringer?

Neither answer is entirely satisfactory. If the court dismisses the claim by reason of the owner's failure to prove that the act of infringement cause economic harm, the infringer will get his illegal taking for free, and the owner will be left uncompensated for the illegal taking of something of value. On the other hand, an award of damages might be seen as a windfall for an owner who received no less than he would have if the infringer had refrained from the illegal taking. In our view, the more reasonable approach is to allow such an award in appropriate circumstances.

■■■ Section 504(a) and (b) employ the broad term "actual damages." Courts and commentators agree it should be broadly construed to favor victims of infringement. *See* William F. Patry, *Copyright Law and Practice* 1167 (1994) ("Within reason, any ambiguities should be resolved in favor of the copyright owner."); 4 *Nimmer* § 14.02[A], at 14–12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); *Fitzgerald Publ'g Co.*, 807 F.2d at 1118 ("[A]ctual damages are not ... narrowly focused."); *Sygma Photo News, Inc. v. High Society Magazine*, 778 F.2d 89, 95 (2d Cir.1985) (stating that when courts are confronted with imprecision in calculating damages, they "should err on the side of guaranteeing the plaintiff a full recovery"). *Cf. In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 564 (2d Cir.1994) (noting that any doubts in calculating profits which re-

sult from the infringer's failure to present adequate proof of its costs are to be resolved in favor of the copyright holder), *abrogated on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994).

 A principal objective of the copyright law is to enable creators to earn a living either by selling or by licensing others to sell copies of the copyrighted work. *See* U.S. Const. Art. I, § 8, cl. 8 ("Congress shall have the power ... [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."); Statute of Anne, 1709, 8 Anne, ch. 19 (Eng.), *reprinted in* III Patry, *supra,* at 1461 (first establishing copyright protection for authors because "Printers, Booksellers, and other Persons, have of late frequently taken the liberty of printing, reprinting, and publishing ... books, and other writings, without the consent of the authors or proprietors of such books and writings, to their very great detriment, and too often to the ruin of them and their families").

If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for. We can see no reason why, as an abstract matter, the statutory term "actual damages" should not cover the owner's failure to obtain the market value of the fee the owner was entitled to charge for such use.

The problem is roughly analogous to illegal takings or uses in other contexts outside the realm of copyright. For example:

(a) D, who lives on property adjacent to P, without authorization regularly swims and canoes in P's lake and uses a road crossing P's land because it provides more direct access to town. The right to use P's property for such purposes has a fair market value. P proves neither harm to his property nor loss of opportunity to license others to use the property for such recreation. Nonetheless P has lost the revenue he would have recovered if D had paid the fair market value of what he took.

(b) P, the owner of a baseball stadium charges $50 for admission to games. D, through a corrupt arrangement with a stadium usher, sneaks in free on days when the stadium has excess seating capacity. P shows no economic injury inflicted by D's free entrance, other than the hypothetical loss of the revenue for the tickets D did not purchase.

(c) P Telephone Company charges set rates for calls on its lines. D devises an electronic "black box" that emits signals mimicking the telephone company's codes, enabling D to place calls without charge. D places free calls at late-night, off-peak hours when the telephone lines are underutilized, and P is unable to prove any loss inflicted by the unauthorized use, other than its failure to collect its regular rates.

(d) P is a public transportation system. D, a subway rider, jumps the turnstile and avoids paying the normal $1.50 fee.

(e) P, a manufacturing company in reorganization, owns (or leases) warehousing space in a warehouse facility. Because of P's financial and

legal difficulties, the space has been unused for some time. D company, which leases adjacent warehouse space, noting that P's space is not being used, secretly uses P's space to warehouse its own inventories.

In each of these cases, the defendant has surreptitiously taken a valuable right, for which plaintiff could have charged a reasonable fee. Plaintiff's revenue is thus smaller than it would have been if defendant had paid for what he took. On the other hand, plaintiff's revenue is no less than it would have been if the defendant had refrained from the taking. In our view, as between leaving the victim of the illegal taking with nothing, and charging the illegal taker with the reasonable cost of what he took, the latter, at least in some circumstances, is the preferable solution.

It is important to note that under the terms of § 504(b), unless such a foregone payment can be considered "actual damages," in some circumstances victims of infringement will go uncompensated. If the infringer's venture turned out to be unprofitable, the owner can receive no recovery based on the statutory award of the "infringer's profits." And in some instances, there will be no harm to the market value of the copyrighted work. The owner may be incapable of showing a loss of either sales or licenses to third parties. To rule that the owner's loss of the fair market value of the license fees he might have exacted of the defendant do not constitute "actual damages," would mean that in such circumstances an infringer may steal with impunity. We see no reason

why this should be so. Of course, if the terms of the statute compelled that result, our perception of inequity would make no difference; the statute would control. But in our view, the statutory term "actual damages" is broad enough to cover this form of deprivation suffered by infringed owners.

■ We recognize that awarding the copyright owner the lost license fee can risk abuse. Once the defendant has infringed, the owner may claim unreasonable amounts as the license fee—to wit Davis's demand for an award of $2.5 million. The law therefore exacts that the amount of damages may not be based on "undue speculation." *Abeshouse*, 754 F.2d at 470. The question is not what the owner would have charged, but rather what is the fair market value. In order to make out his claim that he has suffered actual damage because of the infringer's failure to pay the fee, the owner must show that the thing taken had a fair market value. But if the plaintiff owner has done so, and the defendant is thus protected against an unrealistically exaggerated claim, we can see little reason not to consider the market value of the uncollected license fee as an element of "actual damages" under § 504(b).[5]

■ We recognize also that finding the fair market value of a reasonable license fee may involve some uncertainty. But that is not sufficient reason to refuse to consider this as an eligible measure of actual damages. Many of the accepted methods of calculating copyright damages require the court to make un-

---

5. Furthermore, the fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made. Thus, assuming the defendant made infringing use of a Mickey Mouse image for a single performance of a school play before schoolchildren, teachers and parents with tickets at $3, the fair market value would not be the same as the fee customarily charged by the owner to license the use of this image in a commercial production.

certain estimates in the realm of contrary to fact. *See* 4 *Nimmer* § 14.02[A], at 14–9. A classic element of the plaintiff's copyright damages is the profits the plaintiff would have earned from third parties, were it not for the infringement. *See* 4 *Nimmer* § 14.02[A], at 14–9 to 10. This measure requires the court to explore the counterfactual hypothesis of the contracts and licenses the plaintiff would have made absent the infringement and the costs associated with them. *See Fitzgerald Publ'g*, 807 F.2d at 1118 (actual damages measured by "the profits which the plaintiff might have earned were it not for the infringement"); *Stevens Linen Assocs. v. Mastercraft Corp.*, 656 F.2d 11, 15 (2d Cir.1981) (same). A second accepted method, focusing on the "infringer's profits," similarly requires the court to explore circumstances that are counterfactual. The owner's entitlement to the infringer's profits is limited to the profits "attributable to the infringement." 17 U.S.C. § 504(b). The court, therefore, must compare the defendant's actual profits to what they would have been without the infringement, awarding the plaintiff the difference. Neither of these approaches is necessarily any less speculative than the approach that requires the court to find the market value of the license fee for what the infringer took. Indeed, it may be far less so. Many copyright owners are represented by agents who have established rates that are regularly paid by licensees. In such cases, establishing the fair market value of the license fee of which the owner was deprived is no more speculative than determining the damages in the case of a stolen cargo of lumber or potatoes. Given our long-held view that in assessing copyright damages "courts must necessarily engage in some degree of speculation," *id.* at 14, some difficulty in quantifying the damages attributable to infringement should not bar recovery. *See* 4 *Nimmer* § 14.02[A], at 14–12 ("[U]ncertainty will not preclude a recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement."); II Paul Goldstein, *Copyright* § 12.1.1, at 12:6 (2d ed. 2000) ("Once the copyright owner shows a connection between infringement and damage, uncertainty about the amount of damages will not bar an award."); *Szekely*, 242 F.2d at 269 (where "legal injury is certain ... [w]e should not allow difficulty in ascertaining precisely the value of the right destroyed, which difficulty arises largely from the destruction, to enable the infringer to escape without compensating the owner of the right").

#### d. *Governing Authority*

The decisions of this and other courts support the view that the owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer.

Although the Supreme Court has never directly addressed this question, it has suggested in the somewhat different context of a fair use analysis that a critical question is "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Nation Enters.*, 471 U.S. at 562, 105 S.Ct. 2218.

In *Szekely*, a 1909 Act case, we awarded such damages. A screenwriter sued a film distributor for damages based on its distribution of a film employing the plaintiff's

screenplay. The plaintiff had contracted with a movie producer to sell the screenplay for $35,000. However, the producer encountered financial difficulties, and failed to complete the purchase, leaving the ownership of the screenplay with the plaintiff. The production company nonetheless made the film using the plaintiff's screenplay. The screenwriter sued the distributor for infringement, and the distributor was held liable. The plaintiff's award of damages was based on the amount of the license fee the plaintiff would have been entitled to charge, calculated by reference to the contract the plaintiff had made with the production company. *See Szekely*, 242 F.2d at 268–69.

In *Abeshouse*, under the current Act, we again awarded such damages. The plaintiff had licensed the defendant to be the plaintiff's exclusive distributor for a poster design showing a Rubik's Cube solution. The defendant secretly caused infringing posters to be printed by an independent source and sold them. We upheld an award of damages under § 504(b) in two parts: one part consisting of the infringer's profits from its sale of the infringing posters; the second part representing the payments the plaintiff would have received if the defendant had obtained the infringing posters from the plaintiff. *See Abeshouse*, 754 F.2d at 470–71.

In *Koons,* the defendant, a famous pop art sculptor, appropriated the plaintiff's copyrighted photograph of a couple with a litter of puppies, and caused his workshop to fabricate a work of sculpture copying the plaintiff's image. In rejecting the defendant's claim of fair use, we observed that while a finding of infringement would not necessarily prevent the defendant from publishing his expression, "it does recognize that any such exploitation must at least entail 'paying the customary price.' "

*Koons,* 960 F.2d at 310 (quoting *Nation Enters.,* 471 U.S. at 562, 105 S.Ct. 2218). In remanding to the district court to assess the plaintiff's actual damages we observed that "a reasonable license fee for the use of [the plaintiff's work] best approximates the market injury sustained by [the plaintiff] as a result of [the defendant's] misappropriation." *Id.* at 313. *See also Ringgold v. Black Entertainment Television,* 126 F.3d 70, 81 (2d Cir.1997) (fact that infringement had little likelihood of adversely affecting sales of licensed poster of copyrighted artwork "deserves little weight [in fair use analysis] against a plaintiff alleging appropriation without payment of a customary licensing fee").

*Szekely, Abeshouse,* and *Koons* are supported by the decisions of other Circuits, as well as district courts. In *Nucor Corp. v. Tennessee Forging Steel Serv., Inc.,* 513 F.2d 151, 152 (8th Cir.1975), a 1909 Act case, the defendant infringed on the plaintiff's architectural plans. After a trial on damages, the jury returned with a verdict of no damages. *See id.* On appeal, the Eighth Circuit held that the district court had erred by failing to instruct the jury that the defendants were liable for the "fair value," or market value, of the infringed plans. *See id.* at 153 & n. 3.

In *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174 (9th Cir.1977), where the defendant had produced commercials infringing on the plaintiff's television show, the Ninth Circuit approved a jury instruction that allowed the jury to award an amount approximating "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."

In *Kleier Adver., Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1039 (10th Cir. 1990), the defendant automobile dealership infringed for twenty-two months upon an advertising agency's syndicated advertis-

ing program. The Tenth Circuit upheld the jury's award of damages, concluding that the jury had intended an award of actual damages that represented the plaintiff's lost license fees over the twenty-two month period. *See id.* at 1040.

In *Encyclopedia Brown,* a cable television company and various cable operators infringed on the plaintiff's television program. The district court rejected the defendants' argument that the plaintiff's claim for a reasonable license fee was not cognizable as a matter of law. The court reasoned that if the lost sale of a product to a third party customer constitutes "actual damages," then the lost sale of a license to a defendant who, absent the infringement would have paid for a license, may constitute "actual damages" as well. *See Encyclopedia Brown,* 25 F.Supp.2d at 399–402. The court found authorization for such an award in *Koons. See Encyclopedia Brown,* 25 F.Supp.2d at 401 (quoting *Koons,* 960 F.2d at 313).

In *Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co.,* 542 F.Supp. 252 (D.Neb.1982) the defendant construction company, after first engaging the plaintiff architectural firm to design an apartment complex, subsequently copied and used the plaintiff's plans in construction of an apartment complex on a neighboring parcel of land. The court determined that the fair market value of the modified architectural plans was the relevant measure for actual damages, and calculated that amount by determining "the amount [defendant] would reasonably have paid to the plaintiff and the plaintiff would reasonably have expected to receive for the revision and use of the [first set of] plans." *Id.* at 263. In *Kleier Adver. Co. v. James Miller Chevrolet, Inc.,* 722 F.Supp. 1544, 1546 (N.D.Ill. 1989), where the facts were similar to the Tenth Circuit's *Kleier* case cited above, the court awarded lost license fees, which it

characterized as "actual damages," as well as the infringer's profits. *See also Curtis v. General Dynamics Corp.,* No. C89–566S, 1990 WL 302725, at *11 (W.D.Wash. Sept.26, 1990) (awarding plaintiff photographer the fee he would have been paid had defendant hired him instead of infringing his copyright); *Bishop v. Wick,* No. 88 C 6369, 1988 WL 166652, at *5 (N.D.Ill. Dec.29, 1988) ("Plaintiffs shall recover the fair market value of the [infringed computer program] in an amount equal to the ordinary licensing fees charged to licensees of plaintiffs, multiplied by each time that defendants illegally copied or utilized the [program]." (emphasis omitted)); *Sherry Mfg. Co. v. Towel King,* 220 U.S.P.Q. 855, 859 (S.D.Fla.1983) (awarding actual damages based on reasonable royalty which should have been paid for license to use infringed design), *rev'd on other grounds,* 753 F.2d 1565 (11th Cir.1985).

e. *Commentators*

Commentators on copyright law are divided on the question whether actual damages may be calculated based on lost license or royalty fees. Professor Goldstein's treatise regards an award to the copyright owner representing the fair market value of the royalty payment that the defendant avoided by infringing as clearly included within the concept of the copyright owner's "actual damages." *See* II Goldstein § 12.1, at 12:4. Indeed this discussion is prominently featured in opening discussion of "Damages and Profits." At the outset of his discussion of damages, Professor Goldstein offers the illustrative hypothetical in which Publisher B publishes an unauthorized French translation of Publisher A's novel. The treatise postulates:

> If, instead of infringing, ... B had negotiated with ... A for a license ..., the parties would probably have agreed upon a license fee giving ... A royalties

roughly equal to the royalties that some other translator would have been willing to pay for the license and, at the same time, offering the prospect of profit to ... B. *The negotiated license fee that Publishers A and B would have agreed upon represents the damage that Publisher A will suffer when Publisher B publishes its translation without obtaining a license.*

*Id.* (emphasis added) (footnote omitted).

In exploring the subject in greater detail, Goldstein remarks:

If the infringer occupies the same market as the copyright owner, courts usually employ [the owner's] lost sales as the measure of damages on the assumption that every sale made by the defendant is one that the plaintiff otherwise could have made. If the infringer occupies a market that the copyright owner has not yet entered, *courts usually employ a market value or reasonable royalty measure of damages* on the assumption that the value of the copyrighted work in defendant's market corresponds to the sum that the copyright owner and the infringer would have agreed upon for licensing the work's use in that market.

II Goldstein § 12.1.1.1, at 12:7 (emphasis added) (footnote omitted).

In cases where, before the infringement, the copyright owner had licensed the infringer or a third party ..., courts will generally employ the [hypothetical] negotiated license fee as the measure of the copyright owner's damages from the infringement.

II Goldstein § 12:1.1.1, at 12:11. Goldstein thus justifies such an award by the fact that the infringer has illegally taken something of value and may properly be required to pay for its fair market value.

The Nimmer treatise takes the opposite view, expressing the opinion that a "rea-sonable royalty" measure of actual damages should not be regarded as authorized by § 504(b). *See* 4 Nimmer § 14.02[A], at 14–13 to 17. The argument proceeds as follows. First it postulates that such damages were not available under the 1909 Act. *See id.* at 14–16. Under the terms of that Act, discretionary statutory damages were easily available to all plaintiffs. Because of the availability of statutory damages, courts shied away from awards of "actual damages" that were impossible or difficult to quantify.

[G]iven the availability of statutory damages, the courts under the 1909 Act rejected the "reasonable royalty" standard, a patent measure of damages that looks to the royalties customarily paid for the type of use to which the defendant has put the infringing material....

*Id.*

Nimmer recognizes that under the 1976 Act, Congress altered the availability of statutory damages, making them much less widely available. *See id.* Nonetheless, Nimmer asserts that use of the term "actual damages" in the 1976 Act does not encompass the loss of the royalties payable by the infringer. *See id.*

To justify this conclusion, Nimmer discusses *Deltak*, in which the Seventh Circuit found the owner entitled to an award of the value of use the infringer had for free. The court believed this value could constitute the owner's actual damages. Nimmer contends that the court's "logic relies on the most transparent of fictions—if not for the infringement, there would have been no saved acquisition costs to [the defendant] and *a fortiori* no losses to [the plaintiff]." *Id.* at 14–16 to 17. The reason that it would be a "transparent fiction" to postulate the price at which the defendant might have purchased a license from the plaintiff was that the defendant

in *Deltak*, being the plaintiff's competitor seeking to steal business from the plaintiff, would not have paid the plaintiff's price to buy each of the copies the defendant subsequently sold. . *See id.* at 14–16 to 17. Had the infringer not taken by infringement, it would not have taken at all, and the owner would have earned no additional revenue.

Recognizing that the unavailability of reasonable royalties as a measure of actual damages, combined with the absence of statutory damages for owners who failed to register their copyrights would, in certain circumstances, deprive copyright owners of all compensation, Nimmer suggests that perhaps Congress intended to leave such copyright owners remediless to create an incentive to owners to register their copyrights so as to qualify for statutory damages. *See id.* at 14–17.

We are not persuaded by Nimmer's reasoning. First, but perhaps least important, the Nimmer treatise's assertion that "the courts under the 1909 Act rejected the 'reasonable royalty standard,'" *id.* at 14–16, seems overstated. Nimmer cites only one case which so held.[6] *See Widenski v. Shapiro, Bernstein & Co.*, 147 F.2d 909 (1st Cir.1945). However, other courts, including ours, took the contrary position under the 1909 Act. *See, e.g. Szekely*, 242 F.2d at 268–69 (assessing damages based on the hypothetical license fee the infringer avoided paying); *Nucor*, 513 F.2d at 153 & n. 3 (defendants liable for market value of infringed architectural plans).

Second, even if under the 1909 Act *Widenski's* ruling had been universally accepted, it would not necessarily follow that courts should similarly decline to award such damages under the 1976 Act. Nimmer does not argue that the *Widenski* ruling was required by the definitional terms of the 1909 Act. To the contrary, the treatise explains that the reason underlying reluctance to award such damages under the 1909 Act was that courts could more easily accomplish the same result, avoiding problems of speculative proof, by making a discretionary award of statutory damages which were then freely available. But when the 1976 Act made statutory damages less widely available, explicitly denying them to copyright owners who had not registered their copyright at the time of the infringement, *see* 17 U.S.C. § 412, the reason supporting the *Widenski* court's ruling disappeared.

Third, Nimmer's argument with respect to *Deltak*, that an effort to estimate the royalty the defendant might have paid had it negotiated with the owner rests on "the most transparent of fictions," 4 Nimmer, § 14.02[A], at 14–16 to 17, may be pertinent to the peculiar facts of that case, but for two reasons does not justify a general rule denying damages based on the market value of the use appropriated by the infringer.

As the Goldstein treatise explains, whether the infringer might in fact have negotiated with the owner or purchased at the owner's price is irrelevant to the pur-

---

**6.** The other cases Nimmer lists, *see* Nimmer at § 14.02[A], at 14–16 n. 44, are, as he implicitly acknowledges, not directly on point. *See Woolworth Co.*, 344 U.S. at 232–33, 73 S.Ct. 222 (holding that district court did not abuse its discretion in awarding higher statutory damages where defendant had proved a lower figure for profits but evidence of plaintiff's actual damages had been excluded); *Childress*, 798 F.Supp. at 990–91 (noting dis-

agreement between Nimmer, who finds "reasonable royalties" impermissible, and Goldstein, who believes they are not inconsistent with the 1976 Act); *Lundberg v. Welles*, 93 F.Supp. 359, 362 (S.D.N.Y.1950) (questioning *Widenski* as applied to evidentiary question whether inquiry into infringer's profits is permissible where there is no established royalty and no direct evidence of plaintiff's loss).

pose of the test. *See* II Goldstein § 12.1.1.1, at 12:13. The pertinence of the test is not premised on the fictive belief that the copyright owner is worse off than if the infringer, instead of infringing, had done nothing. It proceeds on a different basis. The hypothesis of a negotiation between a willing buyer and a willing seller simply seeks to determine the fair market value of a valuable right that the infringer has illegally taken from the owner. The usefulness of the test does not depend on whether the copyright infringer was in fact himself willing to negotiate for a license. The honest purchaser is hypothesized solely as a tool for determining the fair market value of what was illegally taken.

Furthermore, even if the larcenous intentions of the *Deltak* infringer furnished a valid reason to decline to award damages *in that case* for the fair market value of what the infringer took for free, that circumstance, as noted above, would not apply to all copyright infringement cases. Honest users can infringe by reason of oversight or good faith mistake. The infringer may have mistakenly believed in good faith that the work was in the public domain, that his licensor was duly licensed, or that his use was protected by fair use. On the record before us, there is no reason to believe the Gap had any intention to infringe a copyright.

\* \* \* \* \* \*

We conclude that Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use. Davis adduced sufficiently concrete evidence of a modest fair market value of the use made by the Gap. The Gap's use of the infringed matter was substantial. If Davis were not compensated for the market value of the use taken, he would receive no compensation whatsoever.

### C. *Punitive Damages*

■ The district court correctly held that Davis is not entitled to punitive damages under the Copyright Act. *See Davis I*, 1999 WL 199005, at \*8. As a general rule, punitive damages are not awarded in a statutory copyright infringement action. *See* 4 *Nimmer* § 14.02[B], at 14–23 to 24; *Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir.1983). The purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement. *See* 4 *Nimmer* § 14.02[B], at 14–23 to 24; *Kamakazi Music Corp. v. Robbins Music Corp.*, 534 F.Supp. 69, 78 (S.D.N.Y.1982). In any event, the question need not detain us long because Davis has failed to show willfulness on the Gap's part.

### D. *De Minimis Use*

■ The Gap contends that even if we find fault with the district court's reasons, its dismissal should be affirmed under the doctrine *de minimis non curat lex* because any copying of protected matter was trivial. The *de minimis* doctrine essentially provides that where unauthorized copying is sufficiently trivial, "the law will not impose legal consequences." *Ringgold*, 126 F.3d at 74. *See also Knickerbocker Toy Co. v. Azrak–Hamway Int'l, Inc.*, 668 F.2d 699, 703 (2d Cir.1982) (denying relief under *de minimis* doctrine where defendant had made a copy of plaintiff's work, but copy was never used); *American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 916 (2d Cir.1994) (suggesting that if photo-

copying for individual use in research is *de minimis*, it would not constitute an infringement); Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued,* 44 U.C.L.A. L.Rev. 1449, 1457–58 (1997).

 The *de minimis* doctrine is rarely discussed in copyright opinions because suits are rarely brought over trivial instances of copying. Nonetheless, it is an important aspect of the law of copyright. Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. We do not hesitate to make a photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator. Parents in Central Park photograph their children perched on José de Creeft's Alice in Wonderland sculpture. We record television programs aired while we are out, so as to watch them at a more convenient hour.[7] Waiters at a restaurant sing "Happy Birthday" at a patron's table. When we do such things, it is not that we are breaking the law but unlikely to be sued given the high cost of litigation. Because of the *de minimis* doctrine, in trivial instances of copying, we are in fact not breaking the law. If a copyright owner were to sue the makers of trivial copies, judgment would be for the defendants. The case would be dismissed because trivial copying is not an infringement.

 The Gap seeks to avail itself of the *de minimis* rule. It argues that even in advertising, it is a trivial matter for persons to be shown wearing their eyeglasses or wristwatches. The Gap's argument may well be valid in other circumstances, but does not fit these facts.

Here, the combination of circumstances convinces us that the *de minimis* doctrine is not applicable. In the "fast" advertisement, the infringing item is highly noticeable. This is in part because Davis's design and concept are strikingly bizarre; it is startling to see the wearer peering at us over his Onoculii. Because eyes are naturally a focal point of attention, and because the wearer is at the center of the group— the apex of the V formation—the viewer's gaze is powerfully drawn to Davis's creation. The impression created, furthermore, is that the models posing in the ad have been outfitted from top to bottom, including eyewear, with Gap merchandise. All this leads us to conclude that the Gap's use of Davis's jewelry cannot be considered a *de minimis* act of copying to which the law attaches no consequence.

### E. *Fair Use*

 Finally, the Gap contends its advertisement was protected by the fair use doctrine, and that the dismissal could be affirmed on that basis. Fair use is a judicially created doctrine dating back nearly to the birth of copyright in the eighteenth century, *see Burnett v. Chatwood,* 2 Mer. 441, 35 Eng. Rep. 1008–09 (Ch. 1720); *Gyles v. Wilcox,* 26 Eng. Rep. 489 (Ch. 1740), but first explicitly recognized in statute in the Copyright Act of 1976. *See* 17 U.S.C. § 107 (1994).[8]

---

7. The Supreme Court in *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 447–56, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) found such recording would also be protected by the fair use doctrine.

8. 17 U.S.C. § 107 provides:
 Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an

■ We review the Gap's claim of fair use in light of the Supreme Court's clarification in *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994), of the relationship among the four factors specified in the statute as appropriate for consideration.

■ The heart of the fair use inquiry is into the first specified statutory factor identified as "the purpose and character of the use." 17 U.S.C. § 107(1). This formulation, as the Supreme Court observed in *Campbell,* 510 U.S. at 578, 114 S.Ct. 1164, draws on Justice Story's famous reference in *Folsom v. Marsh,* 9 F. Cas. 342, 348 (C.C.D.Mass.1841) (No. 4901), to "the nature and objects of the selections made." As the *Campbell* Court explained,

> The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message . . . , in other words, whether and to what extent the new work is "transformative." Although such transformative use is not absolutely necessary for a finding of fair use, the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. *Such [transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space . . . .*

*Campbell,* 510 U.S. at 579, 114 S.Ct. 1164 (emphasis added) (alteration in original) (citations omitted).

Pausing for the moment at that inquiry, we find nothing transformative about the Gap's presentation of Davis's copyrighted work. The ad shows Davis's Onoculii being worn as eye jewelry in the manner it was made to be worn—looking much like an ad Davis himself might have sponsored for his copyrighted design.

The first factor, as spelled out in the statute, goes on to mention "whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). By reason of dicta in the Supreme Court's opinion in *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), to the effect that commercial uses of a copyrighted work are "presumptively . . . unfair," courts have sometimes given "dispositive weight" to whether the secondary use was commercial. *Campbell,* 510 U.S. at 584, 114 S.Ct. 1164 (criticizing *Acuff–Rose Music, Inc. v. Campbell,* 972 F.2d 1429 (6th Cir.1992)). The Supreme Court in *Campbell* rejected the notion that the commercial nature of the use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research . . . are generally conducted for profit," and that Congress "could not have

infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

intended" a rule that commercial uses are presumptively excluded. *Id.* at 584 (internal quotation marks and citation omitted). The commercial objective of the secondary work is merely a factor. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* at 579, 114 S.Ct. 1164.

In this case, as in *Sony*, the secondary use is not transformative. The question whether the new use is commercial thus acquires an importance it does not have when the new work is transformative. In *Sony*, however, the copied work was saved by its private, noncommercial character. *See Sony*, 464 U.S. at 449, 104 S.Ct. 774. Here the work, being an advertisement, is at the outer limit of commercialism. *See Campbell*, 510 U.S. at 585, 114 S.Ct. 1164 ("The use, for example, of a copyrighted work to advertise a product ... will be entitled to less indulgence under the first factor ... than the sale of [the new work] for its own sake.").

■ The second statutory factor, the nature of the copyrighted work, *see* 17 U.S.C. § 107(2), is rarely found to be determinative. *Campbell* explained that "[t]his factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that [with the former] fair use is more difficult to establish." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. In this case, as in *Campbell*, the plaintiff's copyrighted work is in the nature of an artistic creation that falls close to "the core of the copyright's protective purposes." *Id.*

■ The third factor, which looks at the "amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3), recognizes that fragmentary copying is more likely to have a transformative purpose than wholesale copying. In this case, the Gap's ad presents a head-on full view of Davis's piece, centered and prominently featured. The Gap cannot benefit from the third factor.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." *Id.* § 107(4). Although the Supreme Court had observed in dictum in *Nation Enters.*, 471 U.S. at 566, 105 S.Ct. 2218, that this is perhaps the "most important" of the factors, *Campbell* made clear that this dictum, if misunderstood, was capable of causing confusion. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, "it does not produce a harm cognizable under the Copyright Act." *Campbell*, 510 U.S. at 592, 114 S.Ct. 1164. "[T]he role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement, which usurps [the market for the original]." *Id.* (internal quotation marks omitted) (alterations in original unmarked).

■ Thus, when secondary uses harms the market for, or value of, the original, courts must examine the source of the harm. If the harm resulted from a transformative secondary use that lowered the public's estimation of the original (such as a devastating review of a book that quotes liberally from the original to show how silly and poorly written it is), this transformative use will be found to be a fair use, notwithstanding the harm. If, on the other hand, the secondary use, by copying the first, offers itself as a market substitute and in that fashion harms the market val-

ue of the original, this factor argues strongly against a finding of fair use.

*Campbell* explains that the market effect must be evaluated in light of whether the secondary use is transformative.

> [W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly 'supersede[s] the objects,' *Folsom v. Marsh* [9 F. Cas. at 348], of the original and serves as a market replacement for it, making it likely that cognizable [actionable] market harm to the original will occur. But when, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred.

*Campbell*, 510 U.S. at 591, 114 S.Ct. 1164 (citation omitted). Notwithstanding harmful effect, the use may be a fair use.

In this case, as noted, the Gap's use is not transformative. It supersedes. By taking for free Davis's design for its ad, the Gap avoided paying "the customary price" Davis was entitled to charge for the use of his design. *See Nation Enters.*, 471 U.S. at 562, 105 S.Ct. 2218. Davis suffered market harm through his loss of the royalty revenue to which he was reasonably entitled in the circumstances, as well as through the diminution of his opportunity to license to others who might regard Davis's design as preempted by the Gap's ad.

In our view, all the fair use factors favor Davis. We cannot accept the Gap's claim that its use of Davis's design is protected by the fair use doctrine.

## CONCLUSION

Finding no merit to the parties' other contentions, we affirm the grant of summary judgment in favor of the defendant denying Davis's claims for infringer's profits under 17 U.S.C. § 504(b), and for puni-

tive damages; as regards Davis's claims for declaratory relief and "actual damages"under § 504(b), the judgment of the district court is vacated and the case remanded for further proceedings.