Hilda **SEMERDJIAN**, Plaintiff,

v.

**McDOUGAL LITTELL, a Division of Houghton Mifflin Company, and R.R. Donnelley & Sons Company, Defendants.**

No. 07 Civ. 7496 (LMM).

United States District Court, S.D. New York.

June 22, 2009.

---

Maurice Harmon, Christopher Seidman, Harmon & Seidman LLC, Grand Junction, CO, for Plaintiff.

Charles S. Sims, Proskauer Rose LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiff Hilda Semerdjian ("Plaintiff") brings this action against Defendants McDougal Littell ("McDougal"), a division of Houghton Mifflin Company, and R.R. Donnelley & Sons Company ("Donnelley") (collectively, "Defendants"), alleging copyright infringement. Defendants move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the issue of disgorgement of Defendants' profits under the Copyright Act, 17 U.S.C. § 504(b). For the reasons set forth below, Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part.

## I. BACKGROUND

### A. Factual Background

The following recitation of facts reflects an undisputed or otherwise uncontested version of the facts and draws all attendant inferences in Plaintiff's favor. Plaintiff is the daughter and heir of Simon Samsonian ("Samsonian"), a professional painter. (Defendants' Local Rule 56.1 Statement ("Defs.' 56.1 Stmt.") ¶ 1.) McDougal publishes, sells and distributes educational textbooks. (*Id.* ¶ at 2.) McDougal hired Defendant Donnelley to print the textbooks at issue. (*Id.*)

In 1998, McDougal representatives sought Samsonian's permission to include the artist's paintings *Little Girl Reading # 3, Student with Guitar,* and *Senility* (collectively, "the Samsonian Paintings" or "the Paintings") in the 2000 edition of its 9th grade language arts program textbook, *The Language of Literature,* Grade 9, by Applebee, Langer, et al. ("LOL9" or "the Textbook"). (Harmon (Summ. J.) Decl. Exs. 3, 4, 5.) McDougal requested permission to include reproductions of the Samsonian Paintings in 40,000 copies of the 2000 edition of the Textbook. (*Id.*) Samsonian granted McDougal the requested permission by invoice dated November 27, 1998, where he billed McDougal $300 for "the [r]ights/reproduction fees for 40,000 copies of the *Language of Literature,* Grade 9." (Greene (Summ. J.) Decl. Ex. 1)

McDougal included reproductions of the Samsonian Paintings in LOL9, a language arts textbook of over twelve hundred pages. (Def.'s 56.1 Stmt. 6.) The Samsonian Paintings were also reproduced in the teacher's edition of LOL9. (*Id.* at ¶ 9.) In addition to the 2000 edition, McDougal reproduced the Samsonian Paintings in 2002, 2003, and 2006 editions of LOL9 student and teacher's editions. (Harmon (Summ. J.) Decl. Ex. 7, 9–10, 12.) Each painting accompanies a literary work and comprises about one half of one page in the Textbook. (Defs.' 56.1 Stmt. ¶¶ 6–8.) The teacher's edition of the Textbook contains reproductions of the student edition's pages, with that material surrounded by instructional material. (*Id.* at ¶ 9.) In the teacher's edition, *Student with Guitar* is the subject of a mini-lesson that instructs teachers to provide a brief biography of

Samsonian and to ask students what they notice about the aesthetics of the painting and to compare and contrast the girl depicted in the painting with the narrator in the accompanying literary work. (Greene (Summ. J.) Decl. Ex. 5, 2–4.) *Senility* and *Little Girl Reading # 3* are the subjects of similar mini-lessons. (Harmon (Summ. J.) Decl. Ex. 1, 1–2.)

The only permission to reproduce the Samsonian Paintings that McDougal sought (Harmon (Summ. J.) Decl. Ex. 7, 9) and received is reflected in the November, 1998 license, which limits the reproduction to 40,000 copies of LOL9. (Greene (Summ. J.) Decl., Ex. 1.) To date, McDougal has printed over 1.3 million copies of the 2000, 2002, 2003 and 2006 editions of LOL9 (Harmon (Summ. J.) Decl. Ex. 8) and continues to reproduce the Textbook. (Harmon (Summ. J.) Decl. Ex. 7, 9.) McDougal ordered dozens of print runs of LOL9, often in quantities in the tens of thousands of copies. (Harmon (Summ. J.) Decl. Ex. 8.) By the end of 2007, McDougal's gross revenues from the sale of the LOL9 program was about sixty four million dollars. (Panutich Dep. 163:9–18.) Those revenues include sales of both the student and teacher's editions of the Textbook, in which the Samsonian Paintings appear, and ancillary materials, in which the Samsonian Paintings do not appear. (*Id.*)

McDougal hired Defendant Donnelley to print LOL9. (Defs.' 56.1 Stmt. ¶ 11.) It is uncontested that Donnelley had no involvement in selecting LOL9's contents or in obtaining licenses for the copyrighted works contained therein. (*Id.* at ¶¶ 11, 14.) Donnelley's revenues from LOL9 were wholly determined by the quantities of

LOL9 McDougal instructed it to print. (*Id.* at ¶ 16.)

## B. Procedural Background

On August 24, 2007, Plaintiff filed a Complaint in this Court alleging copyright infringement against Donnelley and copyright infringement and fraud against McDougal for its reproduction of the Samsonian Paintings in LOL9.[1] On September 28, 2007, Defendants filed a motion to dismiss the state law fraud claim, which was granted by this Court in a Memorandum and Order dated January 3, 2008, 2008 WL 110942. Plaintiff filed the Second Amended Complaint on June 12, 2008, alleging the copyright infringement claims that are the subject of the instant motion. On November 17, 2008, Defendants moved for partial summary judgment on the issue of disgorgement of Defendants' profits. The motion and opposition were made in conjunction with various evidentiary motions made by both parties, which will also be resolved herein.

## II. DISCUSSION

### A. Defendants' Motion to Exclude Testimony of Sonia Wasco

■ Plaintiff seeks to recover "[a]ctual damages and all profits derived from the unauthorized use of the Samsonian Paintings," (Compl. Prayer for Relief ¶ 2.) Pursuant to the Copyright Act's damages provision, 17 U.S.C. § 504(b), in addition to recovering actual damages, an aggrieved plaintiff can recover any profits the defendant accrued as a result of infringement, so long as those profits are not already accounted for by the actual damages award. § 504(b). In this case, the "fair market value of a license covering the

---

1. Plaintiff's First Amended Complaint included claims based on LOL9, copyright 1997, which claims were subsequently withdrawn at conference before the Hon. Magistrate Judge

Andrew J. Peck. (Plaintiff's Response to Defendants' Motion for Partial Summary Judgment on Plaintiff's Request for Disgorgement of Profits ("Pl.'s Mem.") 4, n. 2.)

defendant's infringing use" represents actual damages. *See On Davis v. Gap, Inc.*, 246 F.3d 152, 172 (2d Cir.2001).

Plaintiff offers the expert testimony of president and part owner of Grant Heilman Photography ("GHP") Sonia Wasco ("Wasco") to establish methods for calculating the reasonable license fee. Wasco's responsibilities at GHP include reviewing all licensing fees for GHP. (Greene (Wasco) Decl. Ex. 1, 6.) Wasco outlines two methods to calculate a reasonable license fee for Defendants' use of the Samsonian Paintings. Defendants move to exclude the testimony, arguing that Wasco's methods are irrelevant to a proper damages analysis under § 504(b) of the Copyright Act and the case law. Defendants argue Wasco's testimony is therefore inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

 Under Federal Rule of Evidence 702, expert testimony, whether of a scientific nature or not, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), is admissible only if it will help the trier of fact understand evidence or resolve a fact in issue. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; Fed. R.Evid. 702. In addition to ensuring the relevance of expert testimony, the trial judge is required to ensure its reliability before it is admitted. *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167.

 In this action, Plaintiff seeks "[a]ctual damages and all profits derived from the unauthorized use of the Samsonian Paintings." (Compl., Prayer for Relief ¶ 2.) "Section 504(b) [of the Copyright Act]

permits a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's infringing use." *On Davis*, 246 F.3d at 172. The standard for determining the fair market value of the infringing use is an objective one—"the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." *Id.* at 167. Actual damages are to be determined from an *ex ante*, or pre-infringement, perspective. *See id.* Finally, an actual damages calculation under § 504(b) cannot encompass punitive elements. *See e.g., Stehrenberger v. R.J. Reynolds Tobacco Holdings, Inc.*, 335 F.Supp.2d 466, 468 (S.D.N.Y.2004). The parties agree on the foregoing but disagree on whether Wasco's damages analysis fit within these standards.

Wasco offers two methods of calculating the reasonable license fee to which the parties would have agreed for printing 1.2 million copies of the Samsonian Paintings in the manner in which Defendants did.[2] The first method is based on the number of printing sessions and the second is based on the number of units of 40,000 copies printed.

Wasco's first method ("the printing session method") calculates a reasonable license fee by multiplying fifty percent of the license fee charged by Samsonian by the number of printing sessions from 1998 through 2006 in which Defendants printed the copyright year 2000 Textbook. (Greene (Wasco) Decl. Ex. 1, 1.) For the years 2002 through 2006, Wasco calculates the reasonable license fee for texts with copyright years other than 2000, and for which no license was secured, as the full

---

**2.** Wasco initially offered three methods for calculating actual damages, but because Plaintiff concedes that the third approach applies an *ex-post,* punitive multiplier to the original license fee to account for infringement, Plaintiff has agreed not to assert Wasco's third approach. (Pl.'s (Wasco) Br. 4.)

license fee multiplied by the number of printing sessions. (*Id.* at 2.) Wasco uses the number of print sessions as a factor, even when Defendants printed less than 40,000 copies in many sessions, because at the time Samsonian granted the license, the industry standard provided for a minimum printing quantity of 40,000 copies per print session. (*Id.* at 1.) Accordingly, a new license would be required each time Defendants printed any quantities beyond the first print session. (*Id.*) Wasco explains that for the years Defendants printed the 2000 copyright year textbook, McDougal would have been entitled to a fifty percent discount to re-license for additional quantities. (*Id.*) As McDougal did not have a license to print the Samsonian Paintings in subsequent editions, no quantity discount would have applied to reproductions in those editions. (*Id.* at 2.)

Wasco's second method ("the extrapolation method") calculates the reasonable license fee by dividing the total number of textbooks printed by the quantity for which McDougal licensed (40,000 copies) and then multiplying that number by the license fee for 40,000 copies. (*Id.*) Wasco reasons that "[s]ince Houghton Mifflin valued 40,000 copies at $200.00, it can be determined that 1,224,927 copies would be worth 30.623 times as much." (*Id.*)

Defendants object to Wasco's general approach to calculating actual damages, arguing that they are "*post hoc*, punitive damages theories relating to an alleged infringer's *unauthorized use* of copyrighted work [that] cannot logically represent an estimate of the fair market value of a license *authorizing* such use on an *ex ante* basis." (Def.'s (Wasco) Br. 3.) Defendants aver that Wasco's report and deposition testimony substantiate their claim that her methods of calculating damages are contrary to the strictures of the Copyright Act and the case law. (*Id.* at 3–4.) Defen-

dants cite Wasco's report, in which she described her task as follows: "[w]hen a licensee decides to print additional quantities above the original requested and agreed upon numbers, the licensing fee can be determined in multiple ways . . . ." (Greene (Wasco) Decl. Ex. 1, 1.) Wasco's deposition testimony communicates the same understanding. There, Wasco stated "[w]hat I did was I described three scenarios by which I felt the industry priced images that exceeded licensing fees." (Wasco Dep. 73: 20–22.) Defendants argue these statements reveal an improper, retrospective analysis of actual damages that seeks to penalize Defendants for infringement.

■■ The Court is not persuaded that these statements indicate that Wasco's methods are either punitive or retrospective. In calculating actual damages, the task is to determine the reasonable license fee for only the reproductions for which McDougal did not obtain a license. *See Davis,* 246 F.3d at 167, 172. McDougal acquired a license from Samsonian to print 40,000 copies of the Samsonian Paintings. (Greene (Summ. J.) Decl. Ex. 1.) Therefore, Plaintiff's task is not to calculate actual damages on the basis of Defendants' first print run because the license allowed for up to 40,000 copies, which Defendants did not exceed at that time. That Wasco described her task as pricing "images that exceeded licensing fees" and evaluating a scenario in which "a licensee decides to print additional quantities above the original requested and agreed upon numbers" indicates only that Wasco's methods calculate actual damages based on the portion of printing for which McDougal had no license. This approach is entirely proper under *Davis. See Davis,* 246 F.3d at 172 ("We conclude that Section 504(b) permits a copyright owner to recover actual damages, in appropriate circumstances, for the

fair market value of a license covering the defendant's *infringing use."*) (emphasis added).

Defendants object to the printing session method on several bases. First, Defendants argue that Wasco's deposition testimony admits a retrospective analysis in devising the method, citing the following exchange:

Q: You say in your report—or no, let me ask you this. Does this approach assume that the permission is requested prior to printing?

A: No, it assumes that I have the information right now and I'm arriving at fees to be charged at that time. The printing has already happened.

(Wasco Dep. 96:11–17.) To further their argument, Defendants point to Wasco's testimony that she would have priced the reasonable license fee at three times the original license fee, consistent with the method proffered by Defendants' expert James H. Pickerell ("Pickerell"), had McDougal indicated in advance a need to print 1.2 million copies. (Wasco Dep. 130:11–131:6.)

Defendants' characterization of Wasco's printing session method as inappropriately retrospective suggests an improper reading of *Davis*. There is nothing in *Davis* that requires the factfinder to disregard information about the details of a defendant's infringing use of copyrighted material in determining actual damages. In fact, "the proper inquiry [is] what price a willing buyer and a willing seller would have agreed on for the *actual use made by the defendant* ...." *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 331 (S.D.N.Y.2003) (quotations omitted) (emphasis added). It is appropriate to consider Defendants' alleged "infringing use" as exactly what it was—dozens of relatively small print sessions. In the textbook publishing market, this manner

of printing would affect the license fee to which a willing buyer and seller would have agreed at the outset, which, in turn, affects an actual damages calculation under § 504(b).

Wasco testified, as did Defendants' own expert, that the publishing industry affords pricing advantages for volume printing. In his textbook, Pickerell writes "[i]f the publisher licensed rights to print 40,000 and then wants to print 40,000 more, the new fee is not the difference between the 40,000 and the 80,000 price, but is a new fee starting from zero. It is to the publisher's advantage to anticipate the total press run and purchase all the rights they need initially." (Harmon (Wasco) Decl. Ex. 2, 4.)

Defendants' argument that the separate print runs should be aggregated for purposes of determining a reasonable license fee fails to persuade that Defendants are entitled to a volume discount. At no point in advance of printing did Defendants indicate that they ultimately intended to print over 1.2 million copies of the Samsonian Paintings, nor did they print those copies in one print session. Instead they printed small quantities of the Textbook in dozens of sessions. Plaintiff is entitled to present the factfinder with an actual damages calculation that accurately reflects the nature of Defendants' reproduction of the Samsonian Paintings.

Defendants attempt to undermine the validity of Wasco's methods by noting that GHP has never actually issued licenses using Wasco's proposed methods. This Court is persuaded by Wasco's explanation that Defendants find themselves in an unusual position for textbook publishers when they licensed for a quantity that they exceeded by over thirty times. As such, the fact that GHP has never issued licenses in a manner consistent with Wasco's proposed methods does not make them

impermissible means of assessing reasonable license fees for purposes of determining actual damages under the Copyright Act.[3]

For the foregoing reasons, Defendants' motion to exclude the expert testimony of Sonia Wasco is DENIED.

### B. Plaintiff's Motion to Exclude Testimony of Jonathan D. Putnam

Defendants offer the testimony of Jonathan D. Putnam ("Dr. Putnam"), an economist, who opines that, based on competitive input market theory, a textbook publisher does not derive any profits from the inclusion of particular images in a textbook and that if a publisher did derive such profits, they would necessarily be accounted for in a reasonable license fee.

In this case, the parties agree that actual damages under § 504(b) of the Copyright Act are represented by the reasonable license fee for the unauthorized use of the Samsonian Paintings represents. *See Davis*, 246 F.3d at 172. They further agree that § 504(b) prohibits recovery of a defendant's profits to the extent that those profits are already accounted for in an actual damages award. § 504(b). Plaintiff objects to the admission of Dr. Putnam's testimony on two grounds. First, Plaintiff argues that the testimony is irrelevant to the damages scheme under § 504(b). Second, Plaintiff argues that the proffered testimony is unreliable. Plaintiff seeks exclusion under Federal Rule of Evidence 702, *Daubert* and its progeny.

Plaintiff argues that the substance of Dr. Putnam's report is that image licensors in the textbook market are fully

compensated by the license fee, and therefore Plaintiff is not entitled to any recovery beyond the reasonable license fee for the Paintings' use. If Dr. Putnam's testimony proceeded as Plaintiff describes, it would not be relevant to a damages analysis under § 504(b), which asks whether Defendants accrued any profits as a result of infringement and whether those profits are already accounted for by actual damages, measured here as the reasonable license fee for the infringing use. *See* § 504(b).

■ However, Dr. Putnam's testimony is not as Plaintiff avers. It is, in sum, that there exist a large number of copyrighted images that are close substitutes for each other such that a given image, which is such a small portion of a whole textbook, is unlikely to increase demand for the textbook and therefore unlikely to cause profits to accrue to the publisher. (Harmon (Putnam) Decl. Ex. 1, 17–18.) He further testifies that if a given image causes any profits to accrue to the publisher, the profits would necessarily equal a reasonable license fee paid to the copyright holder, so long as the market for images in textbooks is a competitive input market operating at equilibrium. (*Id.* at 8, 17–18.) Properly interpreted, Dr. Putnam's analysis is relevant to a damages analysis under § 504(b), which limits a plaintiff's recovery of Defendants' profits to those that were caused by infringement and not duplicative of actual damages, represented in this case by a reasonable license fee. § 504(b); *On Davis*, 246 F.3d at 160.

■ In addition to objecting to Dr. Putnam's conclusions on the basis of relevance, Plaintiff argues that Dr. Putnam's

---

**3.** Defendants argue that both Wasco's methods treat the infringer that licensed for an insufficient quantity more harshly than an infringer who copied protected works with no license at all. The Court finds this argument unpersuasive because it seems to suggest that intentional infringement is a viable business option.

conclusions about the way the market for copyrighted images in textbooks operates are beyond his area of expertise, outside his personal knowledge and based on undisclosed sources. The Court disagrees. Dr. Putnam indicates that he garnered the information that forms the basis for his analysis from various sources, including a review of textbook publisher Houghton–Mifflin Harcourt Publishing Company's licenses for copyrighted images in two other textbooks (also the subject of litigation), conversations with the Director of Rights and Permissions at textbook publisher Holt McDougal, and visits to websites of distributors of copyrighted images. (Harmon (Putnam) Decl. Ex. 1, 3.) These bases for his opinion are sufficient under Federal Rule of Evidence 703. *See* Fed.R.Evid. 703.

Finally, Plaintiff objects to the relevance and reliability of Dr. Putnam's testimony that any profits attributable to the inclusion of a particular image in a textbook are necessarily accounted for by a reasonable license fee for its use. Under § 504(b), an award of the portion of a defendant's profits attributable to infringement cannot be duplicative of an actual damages award. § 504(b). Plaintiff cites to a District of Colorado case, *Beidleman v. Houghton Mifflin Harcourt Publ. Co.*, 2008 WL 4748373 (D.Colo. October 27, 2008), that excluded Dr. Putnam's report as irrelevant in a case similar to this one. The *Beidleman* court reasoned that profits could not be duplicative of actual damages because the parties in that case, as here, were not direct competitors. *Id.* at *3. While for direct competitors, a defendant's gain from infringement is likely approximately equal to the plaintiff's actual damages, because the copyright holder would have lost sales directly to the infringer, § 504(b) does not limit the prohibition on duplicative recoveries to situations where the parties are direct competitors. *See* 17 U.S.C.

§ 504(b). Awards may be duplicative in other circumstances, and Defendants are entitled to argue to the factfinder that this is one of them.

█ Plaintiff also objects to Dr. Putnam's testimony because he fails to outline his calculation of the reasonable license fee and then attribute a portion of that fee to profits to establish that they are duplicative. Plaintiff's critique resonates. If there exist situations where some amount of a textbook publisher's profits can be attributed to the inclusion of a particular copyrighted image, as Dr. Putnam's report seems to imply (Harmon (Putnam) Decl. Ex. 1, 7, 17–18), it is unclear why in these situations, those profits would necessarily be accounted for by a reasonable license fee. But this observation goes to the persuasiveness of Dr. Putnam's testimony and not to its admissibility.

For the foregoing reasons, Plaintiff's motion to exclude the expert testimony of Jonathan D. Putnam is DENIED.

### C. Plaintiff's Motion to Exclude Testimony of Raymond E. Lindley

Plaintiff moves to exclude the testimony of Dr. Raymond E. Lindley ("Dr. Lindley"), pursuant to Federal Rule of Evidence 702 and *Daubert* and its progeny. Dr. Lindley testifies that secondary school administrators do not select language arts textbooks on the basis of their visual arts content. Plaintiff argues that Dr. Lindley's testimony is irrelevant under the damages scheme set forth in § 504(b) and that the testimony is unreliable because it is based on Dr. Lindley's insufficient experience and undisclosed facts.

Dr. Lindley is a school administrator with over twenty years of experience. (Harmon (Lindley) Decl. Ex. 1, ¶ 1.) He is the retired Director of the Office of Educational Improvement and Innovation for

the Oregon State Department of Education, where he oversaw the committee that selected language arts and other textbooks for Oregon's public school students. (*Id.*) Dr. Lindley was president of the National Association of Textbook Selection Administrators ("NASTA")[4] until July 2007. For twelve years, Dr. Lindley was also involved in textbook selection for the state of Oregon, and he served for six years in Idaho on a committee that approved instructional materials used in Idaho's public schools. (*Id.*)

The central conclusion of Dr. Lindley's report is that "textbook selection in language arts is focused exclusively on the quality, appropriateness, and content of the written text—*e.g.*, essays, short stories, activities, and exercises." (*Id.* at ¶ 3.) Dr. Lindley testifies that administrators do not choose language arts textbooks based on the illustrations, and certainly not on the basis of a single illustration. (*Id.*) He posits that in his experience with state academic standards and other written criteria, illustrations, especially in secondary school language arts texts, have never been the basis for selection and that he has never heard anyone advocate for one literature textbook over another on the basis of its illustrations. (*Id.* at ¶¶ 4, 6.)

Defendants offer this evidence to support their argument that Plaintiff cannot establish that any of Defendants' revenues, and therefore profits, from the sale of LOL9 are attributable to infringement. Plaintiff counters on two bases. First, Plaintiff avers that whether the infringing element is the basis for the decision to buy the textbook is irrelevant to a damages analysis under § 504(b); and second, that Dr. Lindley has not set forth sufficient facts to bridge the gap between his experience with textbook selection on NASTA

and as an administrator in Idaho and Oregon and textbook selection at large, or the selection of LOL9, specifically.

■ The Copyright Act § 504(b) provides that an aggrieved copyright holder may recover an infringing defendant's profits, so long as they are attributable to the infringement and not accounted for by an actual damages award. § 504(b). The statute requires the copyright holder to "present proof only of the infringer's gross revenue." *Id.* The Second Circuit has read into the Section's "gross revenue" term a requirement that the revenues be "reasonably related to the infringement, not unrelated revenues." *On Davis*, 246 F.3d at 160. So there is an initial burden on the copyright holder to make a showing of causation—*i.e.*, that the use of the copyrighted work reasonably resulted in gross revenues, and ultimately the profits it seeks to disgorge. *Id.* Upon this showing, the burden shifts to the infringing party to establish that those revenues include deductible costs of production and profits attributable to factors other than the infringing use. *Id.*

In this case, Defendants proffer Dr. Lindley's testimony to counter Plaintiff's evidence that revenues from the sale of LOL9 are reasonably related to the infringement. Defendants' argument is that the Samsonian Paintings did not cause any sales of LOL9, so that use of the copyrighted work did not cause any revenues. This is clearly relevant to § 504(b)'s requirement that a plaintiff limit its recovery of a defendant's damages to those reasonably related to infringement. *See On Davis*, 246 F.3d at 160.

Plaintiff also argues that even if Dr. Lindley's testimony is relevant to the question of causation, it is not based on

4. NASTA is an association of "instructional material supervisors" from twenty two states, whose goal is to enhance the adoption of high-quality educational materials. (*Id.*)

sufficient facts or data, that his personal knowledge is limited to textbook selection in the states of Idaho and Oregon, and that his participation in NASTA affords him insight into state-wide textbook selection in only those states that participate in NASTA—about half the states.[5] Plaintiff offers the testimony of her own expert, Lance Fuhrer, a school administrator for fourteen years, to establish that Dr. Lindley's conclusions are not applicable to textbook selection at large or on the district or local level. Plaintiff also submits evidence that only about half the states select textbooks on the state-wide level, with the remaining states selecting textbooks on the local or district level. (Harmon (Lindley) Decl. Ex. 3.) This evidence, Plaintiff argues, demonstrates Dr. Lindley is unqualified to testify about textbook selection at large, and Plaintiff moves to exclude his testimony on this basis.

■■■ The Court disagrees with Plaintiff's arguments and finds Dr. Lindley qualified, pursuant to Federal Rules of Evidence 702 and 703, to testify as to textbook selection practices. As already discussed, Dr. Lindley's testimony that the Samsonian Paintings did not affect demand for LOL9 will assist the factfinder in determining whether the Samsonian Paintings caused Defendants to earn any revenues and profits. His testimony is therefore relevant under Rule 702. *See* Fed. R.Evid. 702. Federal Rule of Evidence 703 permits an expert to rely on facts and data "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject ...." Fed. R.Evid. 703. Dr. Lindley's two decades of experience in textbook selection, even if that experience primarily involved state-wide, rather than district or local, selection

practices, constitutes a sufficient basis for him to reach the inferences he does—that in general, literature arts textbook selection is not made on the basis of the illustrations. *See id.* To the extent that Plaintiff believes this inference is untenable, she may cross-examine Dr. Lindley on that basis or offer her own expert to counter Dr. Lindley's conclusions.

■■■ Plaintiff argues that Dr. Lindley's negative statements, *e.g.*, he "does not recall seeing any criteria that suggest that literature textbooks for grades 6–12 should be selected because of the aesthetic qualities of any individual illustration ..." should be excluded on the basis that they are not as persuasive as would be positive statements. Plaintiff's argument goes only to the weight and not to the admissibility of this evidence.

Finally, Plaintiff's argument that Dr. Lindley's conclusions have not been applied to the facts of this case is unavailing, especially as she admits Defendants offer his testimony to support the inference that the inclusion of the Samsonian Paintings in LOL9 did not drive any sales of the textbooks, and therefore caused no profits.

For the foregoing reasons, Plaintiff's motion to exclude the testimony of Dr. Raymond E. Lindley is DENIED.

### D. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is

---

**5.** Defendants contend that some NASTA members employ hybrid state-wide and local textbook selection. (Def.'s Opp. 16, n. 8.)

not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir.2004) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

In weighing a motion for summary judgment, ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *See Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). However, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Fed.R.Civ.P. 56) (emphasis omitted). "[C]onclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir.1996) (citations omitted).

 Under § 504(b) of the Copyright Act, 17 U.S.C.S. § 504(b), an aggrieved plaintiff is entitled to disgorgement of the infringer's profits that are reasonably related to the infringement, *On Davis*, 246 F.3d at 160 (2d Cir.2001), and not already accounted for by an actual damages award. § 504(b). Section 504(b) presumes that profits attributable to infringement equal the infringer's gross revenues. § 504(b). Yet, "the statute does not exempt the copyright plaintiff from the requirement of Rule 56 that he respond to a properly supported motion for summary judgment by 'setting forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 522 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e)). If the plaintiff fails to respond with such evidence— "whether that failure is due to the absence of any conceivable connection between the infringement and the claimed revenues, or instead simply due to the plaintiff's inability to muster nonspeculative evidence in support of the alleged causal link—then summary judgment may properly be awarded to the infringer with respect to part or all of the contested revenues." *Id.*

### E. Analysis

Plaintiff seeks disgorgement of Defendants' profits, pursuant to § 504(b), which allows disgorgement of profits attributable to infringement and not accounted for by an actual damages award. § 504(b). Defendants argue that Plaintiff has not met and cannot meet her initial burden of demonstrating that either Defendant's revenues from LOL9 sales are reasonably related to the alleged infringement.

Under § 504(b) of the Copyright Act an aggrieved plaintiff is entitled to

> any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). Importantly, before the burden shifts to a defendant to prove its deductible expenses and then apportion profits between those attributable to infringement and those attributable to other factors, a plaintiff must first demonstrate

that the defendant's revenues are reasonably related to infringement. § 504(b); *On Davis*, 246 F.3d at 160. In this case, Plaintiff bears the initial burden of establishing a causal relationship between the infringement and Defendants' revenues. *See id.* In *On Davis*, the Second Circuit has provided a particularly germane illustration of this principal.

> If a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem.

*Id.* Thus, the starting point for calculating profits to be disgorged is to identify the gross revenues from the infringing product. *See e.g., Hamil America v. GFI, Inc.,* 193 F.3d 92, 104 (2d Cir.1999). The "infringing products" in this case are the student and teacher's editions of LOL9 because they both contain reproductions of the Samsonian Paintings. *See In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 564 (2d Cir.1994). Plaintiff provides evidence that McDougal earned about $64 million in revenues from sales of the LOL9 program, which includes LOL9 ancillary materials, in which the Samsonian Paintings do not appear. (Panutich Dep. 163:9–18.) But even the LOL9 ancillary materials are reasonably related to the infringement in that their usefulness is dependent on access to the LOL9 student and teacher's editions. In this way, revenues derived from the sale of the LOL9 ancillary· materials cannot be said to be unrelated to the infringement. *See On Davis,* 246 F.3d at 160. Plaintiff has satisfied her burden under

§ 504(b) of submitting evidence of revenues reasonably related to the infringement. *See id.*

To require Plaintiff to show what portion of McDougal's revenues from the sale of the LOL9 program materials derived from the use of Samsonian's Paintings would be to improperly shift the burden of apportionment from the Defendant to Plaintiff. Plaintiff's

> limited burden is rooted in strong policy considerations. 'The burden shifting rule in ... 504(b) is ... an equitable response to an infringer who has frustrated the task of apportionment by commingling profits.' Often, as in this case, the defendant has mixed infringing material with non-infringing material and created one co-mingled work. Equity places the burden on a defendant to unravel the threads.

*William A. Graham Co. v. Haughey,* 2006 WL 3386672, at *6 (E.D.Pa.2006) (alterations in original) (quoting *Data General Corp. v. Grumman Systems Support Corp.,* 36 F.3d 1147, 1176 (1st Cir.1994)). The Second Circuit explains the rationale for a plaintiff's limited burden of showing gross revenues related to the infringement, writing "[Plaintiff] presented a *prima facie* case when it established the number of sweaters [bearing the copyrighted design] sold and their initial retail price. The copyright holder cannot realistically be required to offer more proof than this since the facts and figures of the sales and markdowns is a subject exclusively within the infringers knowledge." *In Design,* 13 F.3d at 564.

Defendants argue that Plaintiff cannot meet her burden of establishing a causal connection between Defendants' revenues and the infringement unless she establishes that the inclusion of the Samsonian Paintings prompted purchases of LOL9.

Defendants offer the expert testimony of Dr. Lindley to establish that language arts textbooks are selected according to standardized educational criteria that focus on the quality of the literary works contained in the textbook, and not on the illustrations or the inclusion of any particular illustration. Dr. Putnam also posits that because a given image is such a small portion of a textbook as whole, it cannot be expected to change demand for the textbook. (Harmon (Putnam) Decl. Ex. 1, 14.) While Defendants' evidence that the Samsonian Paintings did not affect demand for LOL9 is persuasive, Defendants incorrectly assert that Plaintiff must establish otherwise to withstand summary judgment.

Defendants cite a number of indirect profits cases to support the proposition that Plaintiff must show that the inclusion of the Samsonian Paintings motivated buyers to purchase LOL9. *See e.g., Mackie v. Rieser,* 296 F.3d 909, 914–16 (9th Cir.2002) (affirming summary judgment where plaintiff failed to establish causal connection between Seattle Symphony's infringing use of plaintiff's artwork in a brochure and revenues from the symphony's Pops series); *Masterson Mkt'g, Inc. v. KSL Recreation Corp.,* 495 F.Supp.2d 1044, 1051 (S.D.Cal.2007) (plaintiff failed to establish causation without evidence showing defendants' alleged infringing use of plaintiff's photographs caused guests to stay at defendants' resort); *Straus v. DVC Worldwide, Inc.,* 484 F.Supp.2d 620, 645–47 (S.D.Tex.2007) (plaintiff unable to establish causation between defendants' infringing use of his photograph and revenues derived from sale of defendants' smoking cessation products). In indirect profits cases the copyrighted work is not part of the product for sale that ultimately generates revenues, but rather is often used to promote the sale of a non-infringing product, such as by way of inclusion of the copyrighted work in an advertisement for the product ultimately for sale. But even in indirect profits cases, not all courts require proof that the infringing use caused consumers to buy. *See e.g., Polar Bear Prods. v. Timex Corp.,* 384 F.3d 700, 715 (9th Cir.2004) ("there is no requirement that Polar Bear put Timex customers on the witness stand to testify that they purchased watches because of Timex's use of 'Paddle Quest' images . . . .").

■ Courts' use of the decision to buy inquiry reflects the more attenuated causal link between infringement and a defendant's revenues where the copyrighted work is not part of the product sold. This inquiry is not necessary to establish causation in a direct profits case, as here. The infringing use of a copyrighted work in a product for sale can cause revenues by increasing the value of the product for sale. A copyrighted work need not directly affect demand for a product to affect revenues and profits. Therefore, in this case, even with Defendants' evidence that the Samsonian Paintings did not motivate buyers of LOL9, there exists a genuine issue of material fact as to whether the inclusion of the Samsonian Paintings affected McDougal's revenues by increasing the value of the Textbooks.

■ As to Defendant Donnelley, however, the decision to buy inquiry is dispositive. The uncontroverted evidence that the Samsonian Paintings did not motivate LOL9 purchases is enough for Donnelley to succeed on its motion for partial summary judgment. Donnelley's involvement in LOL9's publication was limited to printing copies of the Textbook at McDougal's request. (Defs.' 56.1 Stmt. ¶¶ 11, 14.) There is also uncontroverted evidence that Donnelley's revenues from printing LOL9 were determined entirely on the basis of the quantity of Textbooks McDougal requested to be printed. (*Id.* at ¶ 16.) Dr.

Lindley's testimony that inclusion of the Samsonian Paintings did not increase demand for the LOL9 stands uncontroverted. As Donnelley's fees, and therefore revenues and profits, were entirely dependent upon the quantity of Textbooks printed, Plaintiff would have to show that the Samsonian Paintings affected the quantity of LOL9 printed to show a causal connection between the alleged infringement and Donnelley's revenues. Plaintiff has not produced evidence that the Samsonian Paintings affected the quantity of Textbooks Donnelley printed, so Plaintiff has failed to link Donnelley's revenues from the printing of LOL9 to the alleged infringement. *See On Davis,* 246 F.3d at 160. For that reason, Defendants' motion for partial summary judgment is GRANTED as to the issue of disgorgement of Donnelley's profits.[6]

Defendants also argue that if the Samsonian Paintings did generate some profits that accrued to McDougal, those profits are necessarily included in the reasonable license fee that would have been paid for use of the Paintings. Defendants support their argument by offering Dr. Putnam's conclusion that the market for non-exclusive use of copyrighted images in textbooks is a competitive input market, where many close substitutes exist for any given image, and that if such a market is operating at equilibrium, the license fee paid for use of the image accounts for the copyrighted image's entire contribution to the publisher's profits. (Defs.' 56.1 Stmt. ¶¶ 30, 33.) Under § 504(b), if an infringer's profits are already accounted for in the measure of actual damages, disgorgement of those profits is prohibited. § 504(b). In this case, the measure of actual damages is the reasonable license

fee for Defendants' use of the images. *See On Davis,* 246 F.3d at 172. So, if the reasonable license fee is necessarily equal to the profits McDougal accrues as a result of the alleged infringing use of the Samsonian Paintings, recovery of those profits would be prohibited under the Statute. *See* § 504(b).

■ There exists a genuine issue of material fact as to whether a reasonable license fee would necessarily include all profits McDougal derived from its use of the Samsonian Paintings. Central to Dr. Putnam's opinion that the market for non-exclusive rights to reproduce images in textbooks is a competitive input market is the determination that there exist a large number of close substitutes for the inputs, in this case the Samsonian images. (Harmon (Putnam) Decl. Ex. 1, 7.) Plaintiff provides substantial evidence that counters Dr. Putnam's central assumption.

First, all three Paintings were the subjects of mini-lessons in the LOL9 teacher's edition, which instructs teachers to provide students with a brief biography of Samsonian and to discuss with students the aesthetic elements of the Samsonian Paintings and how they relate to aspects of the literary works they accompany. (Greene (Summ. J.) Decl. Ex. 5, 2–4; Harmon Decl. Ex. 1, 1–2.) Second, McDougal's licensing employee Carmine Fantasia ("Fantasia") testified in a similar case that when McDougal chose the images for LOL9 "there was a heavy emphasis on fine art." (Pl.'s 56.1 Stmt., ¶ 45.) Fantasia further testified that McDougal generally viewed the visual arts in literature textbooks as a "teaching tool" and made it a priority to provide teachers with images that would further that goal. (*Id.*) In sum, McDougal's emphasis on fine art as a teaching

---

**6.** Discussion of Defendants' remaining arguments on disgorgement of profits will apply solely to McDougal in light of the summary judgment motion's resolution in Donnelley's favor.

tool in LOL9 and its use of the Samsonian Paintings as the subject of lessons belie Dr. Putnam's contention that the Samsonian images are fungible and operate in a competitive input market. By corollary, if the Samsonian Paintings did not operate in a competitive input market, Dr. Putnam's conclusion that any profits attributable to the Paintings are already accounted for in a reasonable license fee would no longer apply. A reasonable factfinder could then conclude that McDougal's profits attributable to the Samsonian Paintings would not be duplicative of a reasonable license fee.

In light of the foregoing analysis, Defendants' motion for partial summary judgment on the issue of disgorgement of profits is DENIED as to McDougal and GRANTED as to Donnelley.[7]

SO ORDERED.

7. Confidential information is contained in this Memorandum and Order. To preserve confidentiality, it will be filed under seal. The Court requests that the parties identify to the Court by letter those portions of the Memorandum and Order to be redacted within ten days of the date of this Memorandum and Order, after which a redacted version will be filed in the open file.